UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

                    Government,

                                    HONORABLE LAURIE J. MICHELSON
        v.
                                    No. 22-20519

D1: CORTEZ BLAKE,

                    Defendants.
_____/


                    SENTENCING HEARING

        Detroit, Michigan -- Thursday, December 19, 2024


APPEARANCES:

**Jeanine Brunson, Esq.**            **Jerome Sabbota, Esq.**
U.S. Attorney's Office (Detroit)     Ribitwer & Sabbota
211 West Fort Street, #2001          26862 Woodward Ave., Ste. 200
Detroit, Michigan 48226              Royal Oak, Michigan 48067
Tel: (313) 226-9597                  Tel: (248)543-8000
jeanine.brunson@usdoj.gov            contact@ribitwersabbota.com
*On behalf of Government*            *On behalf of Cortez Blake*


                        -   -   -

            To Obtain A Certified Transcript, Contact:
        **Nefertiti A. Matthews, Official Court Reporter**
          **Theodore Levin United States Courthouse**
                **231 West Lafayette Boulevard**
                  **Detroit, Michigan  48226**
        **www.transcriptorders.com • jodi_matthews@mied.uscourts.gov**

        Proceedings recorded by mechanical stenography.
        *Transcript produced by computer-aided transcription.*

**Jury Trial**
**Thursday, August 1, 2024**

1

**I  N  D  E  X**

**-   -   -**

| Hearing: | Page: | Vol.: |
|---|---|---|
| **Objections To Presentence Report** ................3 | | **1** |
| **Objection #1: Paragraph 15, Carjacking Characterization** ................................7 | | 1 |
| Argument By Mr. Sabbota  ........................7 | | 1 |
| Response By Ms. Brunson  .......................8 | | 1 |
| **Ruling By The Court** ............................9 | | **1** |
| **Objection #2: Restitution Issue**  ................9 | | **1** |
| **Ruling By The Court** ...........................10 | | **1** |
| **Sentencing Hearing:** | | |
| Allocution By Ms. Brunson  ....................12 | | 1 |
| Allocution By Mr. Sabbota  ....................18 | | 1 |
| Statement By The Defendant  ...................25 | | 1 |
| **Sentencing By The Court**  ......................31 | | **1** |
| *Appeal Rights* ..................................48 | | |
| Certification of Reporter ......................50 | | |

Exhibits:

None

1              **Detroit, Michigan**

2              **Thursday, December 19, 2024**

3              **2:03 p.m.**

4                    -    -    -

5        **THE CLERK:**   The court calls <u>United States of America</u>

6    <u>versus Cortez Blake</u>; Case Number 22-20519.

7        Counsel, your appearances for the record.

8        **MS. BRUNSON:**   Good afternoon, Your Honor.

9    Jeanine Brunson, on behalf of The United States.

10       **THE COURT:**   Good afternoon.

11       **MR. SABBOTA:**   May it please The Court.   Jerome

12   Sabbota, on behalf of Mr. Blake, Your Honor.

13       **THE COURT:**   All right.   Good afternoon, counsel.

14   Good afternoon, Mr. Blake.   You-all may be seated.   Give me

15   just one moment to get situated here.

16       All right.   Following a jury trial, Mr. Blake was

17   convicted of the November 2021 kidnapping of Taliyah Jackson.

18   We are here today for Mr. Blake's sentencing.   He has been

19   interviewed by probation Officer Shantel Wild, who has prepared

20   a very thorough and very helpful presentence report.

21              **Objection To Presentence Report**

22       **THE COURT:**   The first thing that I would like to do,

23   Mr. Sabbota, is just make sure, did you have an opportunity to

24   review and discuss the presentence report with Mr. Blake?

25       **MR. SABBOTA:**   Yes, I did, Your Honor.

**Objections To Presentence Report**
**Thursday/December 19, 2024**

1   　　　　**THE COURT:**  Mr. Blake, did you have an opportunity to

2   ask Mr. Sabbota any and all questions that you may have had

3   about the presentence report?

4   　　　　**THE DEFENDANT:**  Yes, Your Honor.

5   　　　　**THE COURT:**  And was he able to answer those questions

6   for you?

7   　　　　**THE DEFENDANT:**  Yeah, I mean, like some.  Some yes,

8   some no.

9   　　　　**THE COURT:**  Some -- couldn't answer them or was not

10  the answer you wanted?

11  　　　　**THE DEFENDANT:**  It was kinda like, um, I don't know.

12  It wasn't like it was bad.  It was more so, like -- like, I'll

13  say, like, I want you to do this.  And he'd like -- kinda like

14  tap dance around the issue, like.  I'd be like, oh, I feel like

15  we should object to this enhancement.  And he'd be, like, well,

16  but this, but this, but that.  I'll be, like, man, but I want

17  you to object to this enhancement.  He's just -- and he's just

18  like -- it's kinda, like, blow you off a little bit.  You feel

19  me?  And I'll be like to the point where it's like, well, he's

20  the lawyer.  He been doing this for years.  So, I'mma just -- I

21  guess.

22  　　　　**THE COURT:**  Okay.  There may have been some other

23  portions of the report that you wanted objections made to and

24  you discussed it with Mr. Sabbota and he explained to you why

25  he didn't think that that required an objection or for some

1  reason, he didn't think that would be a good idea to raise that

2  objection.

3          **THE DEFENDANT:**  Yeah, exactly.

4          **THE COURT:**  Well, I don't have any problem giving you

5  additional time to discuss the presentence report with

6  Mr. Sabbota.  If you feel that you would like to do that or

7  that you need to do that before we continue with your

8  sentencing today.

9          **THE DEFENDANT:**  I kinda just want to get this over

10  with.  So, it really don't matter.  I'm just ready to --

11          **THE COURT:**  No, I understand that you want to get it

12  over with.  But I also want to make sure, because that's how

13  you feel today, that may not be how you feel down the road.

14  And so I don't want you to come back later and tell me that you

15  did not have enough time to go through this presentence report

16  with your lawyer and make any objections that you have to it,

17  to The Court.  So, that's why I'm giving you this opportunity,

18  and that's why I asked the question, if you would like to take

19  some time this afternoon to have Mr. Sabbota explain anything

20  else about your presentence report, we can certainly do that.

21  Would you like to do that?

22          **THE DEFENDANT:**  No, I'd rather just go forward.

23          **THE COURT:**  Do you feel like you understand the

24  contents of the presentence report?

25          **THE DEFENDANT:**  Yes, Your Honor.

1          **MR. SABBOTA:**  Your Honor, so, the record's clear, the

2     enhancements he wanted me to object to were the scoring or the

3     points that were assessed by the probation department.  I

4     explained to him there were no legal basis for those

5     objections.

6               **THE COURT:**  All right.

7          **MR. SABOTTA:**  And that's what he's talking about.

8     He's talking about the enhancement for the injury that occurred

9     to the so-called victim because she received -- there was a

10    two-point enhancement, and there was a subsequent two-point

11    enhancement.  And I explained to him that I needed a legal

12    basis to object, and that's what he is unhappy about.

13              **THE COURT:**  Okay.  And he indicated, I just want to

14    make sure that the two of you have had sufficient time to

15    review and discuss the presentence report.  Mr. Sabbota, you

16    have indicated that you did that, and Mr. Blake agrees with

17    that.  And I'm just confirming with Mr. Blake that recognizing

18    there may have been some additional things that you wanted your

19    lawyer to raise, and he addressed with you why he didn't do

20    that, that you've had time to review and discuss with him the

21    presentence report.

22              **THE DEFENDANT:**  Yes, Your Honor.

23              **THE COURT:**  And you've indicated to me that you'd

24    like to go forward, and I understand that.  And so before I

25    hear from the Government, I'll ask you, again, whether you'd

 1   like to take any additional time to meet with Mr. Sabbota to go

 2   over the presentence report.

 3           **THE DEFENDANT:**  No, I'm okay.

 4           **THE COURT:**  All right.  And Ms. Brunson, has the

 5   Government also had an opportunity to review the presentence

 6   report?

 7           **MS. BRUNSON:**  Yes, Your Honor.

 8           **THE COURT:**  Does the Government have any corrections,

 9   additions, or disagreements with the presentence report?

10           **MS. BRUNSON:**  No, Your Honor.

11     **Objection #1: Paragraph 15, Carjacking Characterization**

12           **THE COURT:**  Mr. Blake did raise one objection and

13   that objection is to paragraph 15.  He objects to the

14   characterization as a carjacking.  It is his theory the victim

15   did not avoid being blocked in and set up the hit.  That is

16   addressed in the addendum to the presentence report and also in

17   defendant's sentencing memorandum.  Mr. Sabbota, is there any

18   further argument you'd like to make with respect to this

19   objection?

20   **ARGUMENT BY MR. SABBOTA**

21           **MR. SABBOTA:**  No, Your Honor.  The Court heard the

22   trial.  The Court is well aware of the facts.  Our position

23   still is, this was not -- this was a carjacking -- I'm sorry,

24   this was not a carjacking.  This was a hit on Mr. Blake based

25   on the fact that they had the car.  There was no reason to

1   shoot 40 times at an individual running away from the property
2   once they had the car.  And they're carjacking a car, which I
3   know what the statute states but it was legally rented by the
4   individual that was part of the shooting of Mr. Blake.

5           **THE COURT:**  All right.  Thank you.

6       Ms. Brunson, does the Government have any further response
7   to this objection?

8   **RESPONSE BY MS. BRUNSON**

9           **MS. BRUNSON:**  Your Honor, we argued this during the
10  course of the trial.  And I think the Court is well versed in
11  the facts and circumstances as well as the elements of the
12  offense as it relates to a carjacking.  It doesn't matter
13  whether the car was rented, owned, if someone borrowed it.  The
14  fact of the matter is, is that you cannot use force, and
15  violence, and intimidation to take a vehicle, a motor vehicle
16  from the person or presence of another.

17      And then, obviously, you have the interstate nexus element
18  that Mr. Lee-Stinson and his compatriots discharged their
19  firearms towards Mr. Blake during the course of the carjacking.
20  Their reasons for doing so, the Government can't explain.  But
21  as this Court knows, Mr. Lee Stinson, Amaiya Bryant were
22  convicted and sentenced for carjacking and discharging a
23  firearm during and in relation to a crime of violence.

24      And so their version of events doesn't match the facts and
25  circumstances.  This wasn't a so-called carjacking.  It was an

1  actual carjacking for which two individuals were convicted and

2  sentenced.

3                          **Ruling By The Court**

4         **THE COURT:**  All right.  I do recognize and certainly

5  recall that this was part of the defense theory at trial.  And

6  it was argued by the lawyers, but I can't say that the evidence

7  supported it.

8       The victim testified that she had nothing to do with the

9  taking of the car.  Her description of what happened, a group

10  of people taking the car by threats, and ultimately by gunfire,

11  supports a finding of carjacking.  The two people that

12  Mr. Blake mentions in the objection, Amaiya Bryant and Jamar

13  Lee Stinson, were charged with and pled guilty to carjacking.

14  And in any event, this objection does not effect or impact the

15  scoring of the guideline range.  So, I am going to OVERRULE

16  that objection.

17                    **Objection #2: Restitution Issue**

18         **THE COURT:**  I do, though, want to address one other

19  issue that I'm considering akin to an objection, and

20  Ms. Brunson, that is the issue of restitution.  And Mr. Blake

21  makes the point that the loss of the victim's purse and

22  clothing was the result of the carjacking and not the

23  kidnapping.

24         **MS. BRUNSON:**  I agree with that.

25         **THE COURT:**  And I think, though, I have imposed it as

Sentencing Hearing
Thursday/December 19, 2024

10

1   to the other two defendants that I've already sentenced.

2          **MS. BRUNSON:**  That's correct.

3          **THE COURT:**  They didn't raise it.  I didn't catch it,

4   but they didn't raise it.

5          **MS. BRUNSON:**  Right.  But as we are here today for

6   Mr. Blake's sentencing, I don't think the restitution should be

7   imposed based upon the argument raised by Mr. Sabbota, which

8   makes sense.

9          **THE COURT:**  All right.  And then maybe you can look

10  into whether that's remediable for the other two.

11         **MS. BRUNSON:**  I think it is.  And I will advise

12  accordingly.

13                      **Ruling By The Court**

14         **THE COURT:**  All right.  Because I do agree with that,

15  and I'm -- to the extent that is an objection, I will SUSTAIN

16  that, and I will not impose the restitution obligation on

17  Mr. Blake.

18      And so with that, does the defendant have any other

19  disagreements with corrections or additions to the presentence

20  report?  Mr. Sabbota.

21         **MR. SABBOTA:**  I do not.

22                      **Sentencing Hearing**

23         **THE COURT:**  All right.  I have also reviewed and

24  carefully studied the presentence report.  I have received and

25  studied, as well, the parties' sentencing memos.  I handled

**Sentencing Hearing**
**Thursday/December 19, 2024**                                    11

 1  some pretrial motions involving Mr. Blake.  I presided over his
 2  trial, and I have sentenced two of his co-defendants,
 3  Armond Williams and Maijah Greene.  I've not received any other
 4  materials pertaining to the sentencing, and so except as
 5  otherwise stated, I am accepting the presentence report as my
 6  findings of fact, most of which is consistent with the
 7  testimony that was in evidence, that was presented during the
 8  trial.
 9       The base offense level for the kidnapping is 32.  There is
10  a two-level enhancement because the victim was assaulted and
11  suffered serious bodily injury.  There's another two-level
12  enhancement because the offense involved the use of a firearm
13  for an adjusted offense level of 36.
14       Mr. Blake's several prior juvenile and adult convictions,
15  and being under supervision at the time of the current offense,
16  put him in Criminal History Category V.  A base offense level
17  of 36 and a Criminal History Category V, results in an advisory
18  guideline prison range of 292 to 365 months.
19       Counsel, is there any objection to that calculation?
20  Ms. Brunson.
21            **MS. BRUNSON:**  No, Your Honor.
22            **THE COURT:**  And Mr. Sabbota.
23            **MR. SABBOTA:**  No, the calculation is correct.
24            **THE COURT:**  As I did with the other two co-defendants
25  that I have already sentenced, I am giving consideration to

1   Guideline 5H1.1, which now enables The Court to consider a

2   defendant's youth at the time of the underlying offense.  The

3   amendment reflects expert testimony indicating that certain

4   risk factors may affect a youthful individual's development

5   into their mid-20's and contribute to involvement in the

6   criminal justice system while protective factors, including

7   appropriate interventions may promote desistence from crime.

8        Several of these factors would seem to apply to Mr. Blake.

9   But I do want to hear from the parties if they wish to be heard

10  before I make the ultimate determination here.

11       So, Ms. Brunson, let me first inquire, are there any

12  victims who wish to be heard here today?

13           **MS. BRUNSON:**  The victim is not present in court

14  today.  But at some point during the Government's allocation,

15  the victim witness coordinator would read the victim impact

16  statement that she provided.

17           **THE COURT:**  All right.  So, at this time, would you

18  like to make any remarks on the Government's behalf?

19           **MS. BRUNSON:**  Yes, Your Honor.

20           **THE COURT:**  I'm fine if you want to stay at counsel

21  table or if you want to come up to the lecturn.  It's very

22  narrow for both the defendant and defense counsel, so if you

23  want to remain at counsel table, that all right.

24  **ALLOCUTION BY MS. BRUNSON**

25           **MS. BRUNSON:**  I appreciate that.

1    As you have already noted, this Court did sit through

2 Mr. Blake's trial, and it handled the carjacking case, which

3 precipitated the victim's kidnapping.  You're familiar with the

4 facts and circumstances of both incidents, the carjacking and

5 the kidnapping.  And the victim was not involved in Mr. Blake's

6 carjacking or shooting.  And that Mr. Blake continues to blame

7 her, call her a so-called victim and hold firm to this

8 conspiracy theory is baffling.

9    Mr. Blake had every opportunity to assist in the

10 investigation surrounding the carjacking and his shooting.  The

11 Detroit police came to his hospital room within an hour of the

12 incident, but he refused to cooperate.  If Mr. Blake thought

13 the victim was involved, he could have given the police her

14 name, address, social media accounts, her picture, cell phone

15 number, along with a detailed account of where she had been

16 during the two days that they were together in November of

17 2021.  But he didn't.  And quite frankly, that makes sense

18 because the victim had nothing to do with the carjacking or

19 shooting.  There is absolutely no reason that she would

20 suddenly turn on Mr. Blake, someone she has known for most of

21 her life and who she thought of and referred to as her cousin.

22    Now, as far as Mr. Blake's conduct is concerned, this was

23 never about justice.  Justice is logical.  Justice brings

24 closure and a fair resolution to disputes.  But this, his

25 behavior and the conduct of the 1125 Gang members, that was

1   about revenge.  And revenge is emotional and cyclical.  Revenge

2   moves people to retaliate.  And this kidnapping was seeped in

3   retaliation.

4       There were retaliatory shootings, which followed the

5   kidnapping.  And this cycle of violence was disproportionate to

6   the victim's perceived offense, a crime that she didn't even

7   commit.  The carjacking and the shooting cases were

8   investigated by the Detroit Police Department, the Southfield

9   Police Department and the Bureau of Alcohol, Tobacco, Firearms

10  and Explosives.  And those agencies gathered, among other

11  things, phone records, guns, social media records, witness

12  statements, police reports, medical records, pictures and

13  videos.  That investigation lasted for more than one year.  And

14  the victim was never a person of interest, never a suspect and

15  certainly never a defendant.

16      Mr. Blake's treatment of her was cruel and completely

17  unnecessary.  He betrayed her on a deep and visceral level.

18  Trust was broken.  He didn't protect her or help her.  He hit

19  her.  And he directed others to mistreat her.  And the victim

20  was harmed by his actions and by his omissions.  She has

21  experienced grief, loss, anxiety, depression, and shame about

22  this because it was so personal and devastating to be accused

23  of something she did not do.  And to be accused by someone with

24  whom she shared a bond.

25      Betrayals like that are earth-shattering.  And it leaves

1   you questioning what you thought you knew about loyalty, love

2   and trust.  The victim will probably struggle with Blake's

3   betrayal for a long time.  And the Government is asking you to

4   keep that in mind when you fashion a sentence for Mr. Blake.

5   Yes, Ms. Greene, Ms. Kimbrough, and Mr. Blake left scars that

6   were visible.  But Mr. Blake injured this victim in ways that

7   are invisible to the naked eye.

8         At this point I would have our victim witness coordinator

9   read the victim impact statement.

10              **THE COURT:**  All right.

11              **MS. WYATT:**  Good afternoon, Your Honor.

12              **THE COURT:**  Good afternoon.  If you could just state

13   your name for the record, please.

14              **MS. WYATT:**  Sure.  Alex Wyatt.

15         "Dear Judge Michelson, I'm writing this letter to express

16   some of my feelings about the situation that occurred November

17   of 2021.  The situation really traumatized me in every way.

18   I've never in my life been in a situation like this before.

19   The day I thought I'll never live to see another day.  'Till

20   this day, I'm very depressed about it, and I cry everyday.  I

21   had to move to a new city by myself with no family.  Starting

22   2025 it will make three years.  I have not been able to see my

23   family or celebrate any holidays.  I find myself asking myself,

24   why am I even here?  I have to live like I'm half locked up.  I

25   was only 19 when I left and had to be on my own.  Just

**Allocution By Ms. Brunson**
**Thursday/December 19, 2024**

16

1    imagine."

2        "I find myself asking, why did these guys do this to such

3    a nice person?  I've never in my life harmed anyone or did

4    anything wrongly.  I lost so much far as clothes, jobs, and big

5    opportunities being in this situation.  I spent every holiday

6    alone just balling my eyes out.  All I ask is that I get the

7    justice I deserve.  I always think to myself, did anyone in

8    this situation really care about me?  It's so much I want to

9    say but this pretty much sums up everything that I want."

10        Thank you, Your Honor.

11            **THE COURT:**  Thank you, Ms. Wyatt.

12            **MS. BRUNSON:**  Mr. Blake is 23 years old, and he's

13   already a Criminal History Category V.  He has been violent,

14   especially towards women for a long time.  And the PSR reveals

15   childhood experiences, which have manifested in hurtful and

16   terrible ways.  There are many instances in which small

17   slights, like, not getting a birthday present.  Or a girlfriend

18   who was just ready to go home, which triggered violent

19   reactions from Mr. Blake, and his behavior has not improved

20   with age.

21        As the incident report from Milan and the Livingston

22   County Jail reveal, Mr. Blake still hits.  He gets weapons.  He

23   throws furniture.  And he still has tantrums.  So, he remains a

24   danger to the community.  Mr. Blake has suffered many

25   consequences for his behavior throughout this life.  He's been

1    to juvenile.  He's been placed on probation.  And he's been

2    jailed for a litany of on offenses.  But nothing has curbed his

3    conduct and now he has attached himself to a gang.

4        Mr. Blake is swirling the drain.  And this Court must do

5    something before he ends up dead.

6                **THE COURT:**  Do you know, Ms. Brunson, he has not

7    attached himself to the gang?  They created this gang.

8                **MS. BRUNSON:**  Correct.

9                **THE COURT:**  Do you have any sense of how these young

10   men became this 1125 Gang?

11               **MS. BRUNSON:**  Yes, Your Honor.

12               **THE COURT:**  Over someone's suicide?

13               **MS. BRUNSON:**  It was the suicide of Marlon King that

14   happened on November 25th.  So, the eleventh month and the

15   twenty-fifth date.  That's how we get to 1125.

16               **THE COURT:**  But how does that turn into firing 40

17   gunshots at a car?  At a house?

18               **MS. BRUNSON:**  You would have to get into the mindset

19   of the members of the 1125 Gang to answer that question.  I

20   don't know how at all it would honor Marlon King to be

21   remembered this way, through acts of violence, through

22   robberies, through carjackings, through retaliatory shootings.

23   It makes no sense.  But the Government certainly cannot explain

24   the inexplicable.

25       Mr. Blake has well-earned a significant sentence for

1    kidnapping and assaulting the victim.  And the sentence that

2    you impose will interrupt this pattern of abuse, and it will

3    send a firm message that his behavior can no longer be

4    tolerated.

5        Lastly, the Government employs The Court to make

6    trauma-focus therapy, mental health treatment, substance abuse

7    counseling, all a part of Mr. Blake's sentence.  The Government

8    recognizes that it is asking Mr. Blake to change.  And he needs

9    the tools to do that.  If he leans into counseling and

10   completes his education, then he will set himself up for a much

11   better outcome than prison or the grave.

12       So, for these reasons the Government is requesting a

13   sentence of 315 months followed by a five-year term of

14   supervised release.

15           **THE COURT:**  Thank you, Ms. Brunson.

16       And Mr. Sabbota, I will start with you.  Do you wish to

17   make any remarks on Mr. Blake's behalf?

18   **ALLOCUTION BY MR. SABBOTA**

19           **MR. SABBOTA:**  Yes, Your Honor, I do.

20       As The Court is well aware that I filed a presentence

21   memorandum.  And I think that really addresses the background

22   and the history of Mr. Blake.  When you talk about youth, you

23   can see what his youth was like growing up.

24       You know, it's kind of interesting, the Government stands

25   up and says she's really a true victim.  But when Mr. Blake is

**Allocution By Mr. Sabbota**
**Thursday/December 19, 2024**

1    taken to the hospital, and he's taken by her, she never waits

2    around for the police.  She never makes a report to the police.

3    She never tells the police it's a carjacking.  None of those

4    things happen.  And I think you have to look at the dynamics as

5    to what occurred, even assuming it is a carjacking, you don't

6    shoot 40 times at an individual when that individual is running

7    away from the property that you're supposedly carjacking.  You

8    do so if you want -- it you intend to kill.  And I clearly

9    believe that the so-called victim was involved.

10    But the jury has made the decision.  They also made the

11    decision he wasn't guilty of conspiracy, which means they made

12    a decision that there was no agreement initially for him to

13    commit any of these acts.  The charge he was convicted of was

14    joining later on, which is kidnapping, aiding and abetting.

15    And when you look at how Mr. Blake was raised, where he

16    came from, the way he had to take care of himself.  He was an

17    individual that suffered physical abuse.  He was an individual

18    that suffered sexual abuse.  He was an individual at the age of

19    11 or 12 was taking care of himself because he didn't have a

20    mother or a father that was doing it.  There's one instance,

21    which is in the presentence report, which talks about how the

22    father required him to fight an older cousin and he's getting

23    beaten up, and he's getting marks on him, and he has to

24    continue to fight.  And CPS gets involved, and they do a

25    referral, and Mr. Blake is thrown out of the house.

1       So, what do you want?  When you ask why these gangs form,

2   these young people get together for their own protection and

3   for their own safety.  That becomes a family.  I'm not saying

4   it's right.  I'm saying that's where he -- that's how it began.

5   That's why we're standing here.

6       Now, when we talk about the amount of time, I know what

7   the guideline say, the guideline say 24 to 36, whatever the

8   numbers are, it's 24 years to basically 30 years.  Now, that's

9   a lot of time.  He has never served any substantial time.  And

10  when you talk about things that are necessary for him to change

11  his behavior, like, therapy, mental health treatment.  And he

12  understands he needs that.  He doesn't really realize that.

13  Part of it is, I think, his aura that he has to feel tough or

14  be tough when he comes into situations like this.

15      You remember at the time of the verdict, he broke down and

16  he was crying like a baby.  Because he realized he was going to

17  get a substantial amount of time.

18      So, the question is, how much time is really necessary to

19  achieve all of the recommendations that's contained within the

20  presentence report?  Is it 25 years?  Is it 30 years?  Is it 20

21  years?  Sometimes I think probation thinks, I know they have

22  guidelines.  They don't make a recommendation, but, you know,

23  they're told this is what it's got to be to accomplish that

24  result.

25      My recommendation is, something more than 20, 15 to 20

1   years, anywhere within that range, if he's going to accomplish

2   a change in behavior, that's a long enough time for that to

3   occur.  Eventually, he's going to get out, and he realizes,

4   eventually when he's get out, unless this Court imposes a

5   lifetime sentence, he going to get out, if he doesn't change

6   his behavior, he's going to spend the rest of his life in

7   prison.  He knows that.

8       He is young.  I don't know that he's impressionable.  And

9   he's also not as tough he wants everybody to think.  So, I'm

10  asking The Court for a sentence that is not 25 years.  I'm

11  asking for a sentence in the area of 15 to 20 years, with the

12  understanding that he's got to have mental health treatment.

13  He's got to have treatment dealing with his drugs.  He's got to

14  get a high school diploma, and he's has to learn how to be a

15  man.  Nobody has ever taught him that.  Nobody has really never

16  sat him down.  He's never had a role model.  That's all

17  verified by the presentence report.  He goes into the system at

18  the age of 11.  He's in and out of programs, but the programs

19  aren't long.  And then he goes back to the same environment.  I

20  mean, it's one thing to put him in a program for a year and

21  then he comes out.  But when you go back to the same

22  environment, the program is not going to help you.  Where's the

23  things that are supposed to help him?  He's never had that.

24      And so he sits here today, you know, retaliating or

25  involved in a case.  He didn't conspire to kidnap because the

1    jury said he didn't.  He comes in later, and they're looking to

2    find out why she was involved.  And I suggest to The Court she

3    now plays the victim.  But she wasn't so much of a victim when

4    this, in fact, occurred.  Because if she was that much of a

5    victim when she was at the hospital, and the police were coming

6    to the hospital because of the carjacking, their main witness

7    left.  That's something different than what we're looking at

8    here.

9         Here we're looking at what can we do to help him.  And I

10   suggest to The Court 25 years is too long.  He's never done a

11   substantial sentence.  He's 23 years old now.  If The Court

12   gives him to 15 years, he loses the best part of his life.  He

13   doesn't get out until he's 40.  And then with five years

14   supervised released, he's at 45.  And if he violates that, what

15   do you think will happen?  We both know what will happen.  And

16   he still has a state sentence that he has to finish.  So, I ask

17   that whatever sentence be imposed be concurrent.  Thank you.

18        **THE COURT:**  And I imagine you've explained to

19   Mr. Blake that in the Federal system, he could potentially,

20   depending on his behavior, get 56 days of good time credit for

21   every year he serves, which the sentences you-all are talking

22   about, could be some significant time.  I have a sense from the

23   incident reports I've received about his current behavior that

24   so far he's not racking up too many good time credits.  But

25   have you had that discussion -- or have you explained that to

1     him?

2           **MR. SABBOTA:**  I had discussed with him the situations

3     over at both Milan and Livingston County jail, and that's part

4     of the aura -- he has to appear tough in his own mind to

5     protect himself.  He's young.  He goes into Milan.  He's 23

6     year's old.  The average age at Milan isn't 23.  It's a lot

7     older.  So, he's got to protect himself.  You know, I've

8     represented enough of these individuals -- I don't want to say

9     these individuals.  But people that are involved, for lack of a

10    better word, in these groups.  They're not as tough as you

11    think they are when you get them alone.  They're only tough

12    when they come in here because they've got to appear tough.  He

13    understands that you're holding his life in a valance.  And

14    that if he doesn't change that behavior, he's going to end up

15    spending the rest of his life in prison.

16       He also understands that good time, and I've explained it

17    to him, is based on good behavior.  That's why it's called good

18    time.

19           **THE COURT:**  Right.

20           **MR. SABOTTA:**  Right.  If you don't have good

21    behavior, then you don't get the good time.  We're assuming

22    everyone is going to have good behavior to get the good time.

23    But he understands there is a penalty for everything you do.

24    And every time you dance, you eventually will pay the fiddler.

25    You got to -- there's a debt.  Everything's got a consequence.

1   If it's a good consequence, you get a good result.  If it's a

2   bad consequence, you get a bad result.  His whole life, he's

3   been receiving bad consequences because there's never any

4   follow-up.

5       He goes into the juvenile system, they take him out of the

6   house.  Why do they take him out of the house?  Because he's a

7   neglected kid, right?  What do they do with him there?  They

8   put him back.  So, what do you expect is going to happen.  Here

9   you've got substantial numbers that you're talking about.  You

10  know, ten years is a decade, that's a long time.  And I don't

11  really believe that individuals his age understand time until

12  it really happens.  You know, when you get older, you

13  understand what ten years is.  You understand what 20 years is

14  because you never get that back.

15      There's two things in life you never get back:  One is

16  time and one is your health.  You can debate it all day, but

17  you never get time.  You lose time, you lose time.  He's going

18  to understand that now because he's got no choice.  And he

19  understands he's got to change his behavior.  Otherwise, he'll

20  be in prison the rest of his life.

21      So, the question becomes, what is substantial enough under

22  18 U.S.C. 3553, et cetera, to accomplish the results and the

23  purpose.  And I suggest 15 or 20 years is plenty of time for a

24  23-year-old.

25              **THE COURT:**  Thank you, Mr. Sabbota.

1    Mr. Blake, this is your opportunity as well to address The

2  Court regarding sentencing.  Is there anything that you would

3  like to say on your own behalf before The Court gives you your

4  sentence?

5          **THE DEFENDANT:**  Yes, Your Honor.

6          **THE COURT:**  All right.  Please.

7          **MR. SABOTTA:**  Stand up and talk to her.

8  **STATEMENT BY THE DEFENDANT**

9          **THE DEFENDANT:**  Throughout this case there's been a

10  lot going on, man.  And when I got found guilty, I really

11  blamed everybody.  I blamed my momma.  I blamed my pops.  I

12  felt like everybody failed me.  Truth be told, I went through a

13  lot of stuff when I was young because I was afraid to be alone.

14  1125 not no gang.  One of my close friends died, and we were

15  all we had.  My friends got their parents, I don't.  One thing

16  you got to see, you so how many -- both of my co-d's that you

17  sentenced before me, you see how many letters they family wrote

18  them?  How many letters you get from my family?  Ain't nobody

19  write you nothing on my behalf because I understand I really,

20  like, got to understand that I got to become a man on my own.

21    I've got to stop blaming stuff on my parents.  I've been

22  counted out before I even came into this world.  Before I was

23  born, my pops was doing 14 years in prison.  All I ever had was

24  my momma.  My momma did what she is could.  My momma can't

25  raise no man.  So much stuff just been going through my head

1   since this situation happened.  I can sit up here and tell you

2   I feel like I didn't kidnap nobody.  But that's not where I'm

3   at.  I just want to move forward.  What happened, happened.

4   It's in the past.  I got found guilty.

5       I'm just ready want to move forward with my life because I

6   got a son.  My son four.  Me and my dad relationship is

7   terrible.  I don't want my son to hate me.  I know how it feel

8   to be, like, trying to come home and me trying to talk to my

9   son.  My son, like, how you going to tell me something, and I

10  don't even know you?

11      I really, like, been just really been figuring me out.  A

12  lot of stuff I did when I was young, a lot of stuff I've

13  been -- I did in my life, period, is because I was seeking

14  validation.  I cared about what other people thought.  I always

15  thought, like, oh, if I do this, I'm throwing food in the lunch

16  room at school trying to impress other people because I wanted

17  people to like me.  When it's not about what they think.  These

18  people not going to know you in five years.

19      I had to learn to become my own man.  Every since I got

20  like -- when I got found guilty, I blamed Jeanine Brunson,

21  David Cowen, Jerome Sabbota, my momma, my -- I blamed

22  everybody.  Like, I blamed everybody until one day I actually

23  sat down, and I was like, bro, you got to want to change.  I

24  can't just keep talking about it, and talking about it.  I

25  actually got to want to change.

**Statement By The Defendant**
**Thursday/December 19, 2024**

1    Growing up, it was a fire inside of me, like, I just felt
2    like you got to be angry.  I was so angry.  I always wanted to
3    fight everybody, because it was like a copying mechanism.
4    Because nobody know what it feel like to understand that you
5    don't got nobody.  Like when you ain't got nobody.  Yeah,
6    people talk to you on the phone.  People be cool for a couple
7    days.  But when you don't got nobody.  My friends is all I got.
8    And I don't want to sit up here and not express remorse.
9    Because what happened to Taliyah, that situation, it's not
10   okay.  When I think about that, if I had a daughter, and I seen
11   a video of my daughter in that situation, it's terrible.  I
12   understood why they convicted me.  That's terrible.  That's not
13   okay.  But growing up, it's just like that's what I thought was
14   okay.  This what I thought I had to do.  My friends was all I
15   got.  I don't have nobody else.  Taliyah a good person.  She
16   didn't deserve this.  I'm not saying she got kidnapped, but
17   those girls putting their hands on her, she didn't deserve
18   that.  That's not what she deserved.
19   I spent so much time since April 12th figuring life out.
20   I don't even talk to some people I use to talk to no more.  I
21   don't want to look on the past no more.  I'm tired of the past.
22   Because me keep thinking about the past, bro.  I can't make my
23   pops be there for me, bro.  He got snatched by the system.
24   That's what happened.  I can't make my momma be there for me.
25   I can't be mad at me for the decisions that I made.  I just got

**Statement By The Defendant**
**Thursday/December 19, 2024**

28

1  to learn from their mistakes and be like, this what you going

2  to do.  It is sad that I had to be put in this situation where

3  it's too late.

4      I actually realize and start wanting to change when I'm

5  looking at 30 years.  It took me -- it took for me to be put in

6  this situation and be like, bro, you got to become your own

7  man.  Your daddy can't be no man for you.  Your momma can't be

8  no man for you.  Your son can't be no man for you.  Then you

9  gone look at other people.  I look at my friend situations and

10 be like, damn, they -- sorry for my language, but they parents

11 love them.  Their parents still there for them.

12     And I feel like the biggest lesson that I learned is I

13 know I can be myself.  Being yourself is so easy.  I don't why

14 I ain't been doing it.  I don't got to go out my way to impress

15 nobody.  I don't got to go out my way to look tough for nobody.

16 I know I'm not going to let nobody do nothing to me.  I know if

17 somebody tried to do something to me, I can defend myself.

18     I be praying, and I be asking God, like, why is this

19 happening to me, like?  I didn't kidnap nobody.  Like, why is

20 this happening to me?  I actually did not kidnap nobody.  I

21 feel like I'm in a movie.  Like, you're really like about to go

22 to prison for something that you didn't do.  And I be asking

23 God, why is this happening to me?  What did I do?  And the

24 answers He been sending me is, if I would have stayed out

25 there, with the temper that I got, and my values that I had, I

**Statement By The Defendant**
**Thursday/December 19, 2024**

1  would have ended up dead.

2      I actually been learning self-restraint.  I actually been

3  learning, like, sometimes when people say stuff to you, don't

4  always react.  I've actually been learning how not to move off

5  of emotions.  I'm actually learning how to put my childhood in

6  the past.  Because it's bad what happened to me.  My whole

7  childhood was terrible.  But I can't keep dwelling on that.

8  Because keep dwelling on situations like that, I'm never going

9  to move forward, and I'm tired of the past.  I'm tired of

10  everything.  I just want to move forward with my life.  I'm not

11  going to sit up here and ask you, Oh, can you sentence me to

12  this time or that time?  Because that's not my choice.

13      But I want you to understand that I actually have learned

14  something in this situation, did make me the best person I

15  could be.  Truth be told, the Prosecution right, I'm not ready

16  to go back out there right now.  Because I'm still working on

17  myself.  I'm still finding myself.  But everything is coming

18  into play right now.  This situation really changed my life.

19  This situation really fix me.  Because I was broken.

20      When you come from a situation that I come from, you

21  really like -- you doubt every -- you start to doubt yourself,

22  bro.  Like, am I good enough?  Like, what did I do?  I didn't

23  ask to be here.  When it's not that, it's just -- it's life.

24  And the only thing that I could do is be the best person moving

25  forward and do my time.  Come home.  Get a job.  Support my kid

**Statement By The Defendant**
**Thursday/December 19, 2024**

30

1   and fix everything.  And fix the relationships that I feel like

2   is broken on my end.  I ain't got to wait no nobody else.

3      Like I said, what happened to Taliyah is not okay.  Not at

4   all.  That video is terrible.  When I go to Milan -- I mean,

5   when I go to discovery and watch the video, I cut it off.

6   Because that's not okay.  What happened to her in that video,

7   that's not okay at all.  But I understand everything so much

8   better now.

9      It's like I'm actually seeing life in a different light

10  now.  It's like, I don't know like, I just woke up one day and

11  was like, you can't just talk about change, you actually got to

12  want to change.  It's like, these traits that you got, like,

13  somebody say something to you.  You always want to fight or

14  something.  I actually got to want to change.  I actually got

15  to want to not move off impulse.  And the best thing I could do

16  is just thank God for putting me in this situation, because

17  without being put in this situation, I'd still be the same

18  Cortez.  I'd still be the same Cortez out there tripping,

19  stolen car.  Gun on me.  Doing what I want to do.

20      I just want to thank everybody.  Even the prosecution.

21  Even my parents.  Even my lawyer because you-all actually made

22  a man out of me.  And going forward, y'all about to see the

23  best version of me.

24        **THE COURT:**  Thank you, Mr. Blake.  I appreciate

25  hearing from you.  And I certainly do hope -- well, we all

1   hope, everybody in this courtroom hopes, that in the future, we
2   will see the best version of you.  We have to get you through
3   this first.  You may be seated.
4        **MR. SABBOTA:**  They're not as tough as you think they
5   are, are they?

**Sentencing By The Court**

7        **THE COURT:**  Well, I don't know.  They're tough with
8   some people.  And they're tough in some situations.  And they
9   were pretty tough here.

10       But Mr. Blake, I have little doubt that one reason the
11  Sentencing Commission recently amended the guidelines to make a
12  focus on youth more prominent is that, unfortunately, we
13  sentence a lot of young people.  Sentencing anyone is hard
14  enough.  Sentencing our youth is even harder.  Many of those
15  young people have difficult upbringings just like you.  I
16  sympathize with anyone who had to endure those struggles.  Some
17  handle it better than others.  Some come through it less
18  scathed.  Unfortunately, you have not so far.

19       As you say, you are a work in progress.  But for a lot of
20  years, you were not.  And for a lot of years, there was not
21  really a lot of effort to change.  Your misconduct started
22  early, and it's never stopped.  You've never taken part in any
23  programming.  You have almost never complied with any court
24  supervision.  And I'm still not sure you have a full
25  understanding yet of the consequences of your actions.

1    Nor, for most of your life, have you given a damn about

2    them.  And so it was probably only a matter of time before the

3    real bottom would fall out.  Before the probations, you never

4    adhere to, or the light sentences, or the lesser charges, or

5    sometimes even no charges, would do nothing to change your

6    behavior.  And you would be where you are now with a guideline

7    range, without departures, or a variance of 24 to 30 years.

8    And I know from some of our prior court proceedings that

9    you can't even conceive of that.  Because I don't know, again,

10   that you've ever been able to grasps the gravity of this

11   offense.  So, I want to back up and explain why all of this

12   matters.

13   My job now is to impose a sentence that is sufficient but

14   not greater than necessary to achieve the purposes of a number

15   of sentencing factors.  To do that, I start with the guideline

16   range.  And then I evaluate a number of factors that are part

17   of our Federal law, 18 United States Code Section 3553(a), what

18   we call the 3553(a) factors.  And those factors are the

19   following:

20   I start with your history and characteristics and the

21   nature and circumstances of the offense.  Then I consider the

22   need for the sentence imposed to reflect the seriousness of the

23   offense, to promote respect for the law, to provide just

24   punishment for the offense, to afford adequate deterrence to

25   criminal conduct, to protect the public from further crimes by

1    you, and also to provide you with needed educational or

2    vocational training, medical care or other correctional

3    treatment in the most effective manner.

4        You were a little older than some of the other defendants

5    here.  When a teenager is part of a dangerous street gang and a

6    participant in a kidnapping of a teenaged girl, akin to his

7    cousin, when at age 23 he is already at Criminal History

8    Category V, the second highest in the Federal system.  And when

9    that young man has an adverse childhood experience score of ten

10   out of ten, it is usually a sign that there was trouble in his

11   upbringing.

12       And so I start there.  And you have already conveyed the

13   difficulty of your upbringing.  Your youth was one of

14   instability.  Your father spent time in jail for some serious

15   offenses, and the family struggled financially.  There was

16   instability in housing and food.  You lived with family members

17   with mental health and substance abuse issues.  Prior

18   presentence reports indicate that you ran away from home.

19   There was possible sexual abuse.  You had a bad fight with your

20   cousin that your father allowed, stood by, and watched while

21   you were attacked.  And that resulted in some involvement by

22   Child Protective Services.

23       Somewhat ironic here, a youngster being assaulted while

24   others with means to help simply stood by and watched, exactly

25   what happened here.  You witnessed a fight between your father

1   and his girlfriend that resulted in her punching through the

2   glass window, eventually resulting in her death.  No doubt a

3   traumatic experience for a young child.

4        You were kicked out of schools for disruptive behavior.

5   You were in a very volatile relationship with the mother of

6   your child, resulting in several charges and police visits for

7   domestic violence.  That you would one day condone and/or

8   participate in and/or spearhead the mistreatment of a young

9   female, is probably not a significant surprise given your

10  history.

11       You had some mental health treatment as early as first

12  grade.  But as you describe it, by 11 or 12, you were, quote,

13  "In the streets," end quote, and so not abiding by any

14  treatment programs.  You had your first conviction at age 14,

15  home invasion.  It was a home you had been living in.  You

16  stole some clothes and an iPad.  At that time, you were a

17  lookout for an armed robbery business.  Not normal 14-year-old

18  activity.  You spent some time in juvenile detention

19  facilities.  You absconded from supervision.  You had issues

20  with incorrigibility and truancy.  You had many probation

21  violations.  There were outbursts and incidents of anger

22  resulting in your mother calling authorities.  Behavior that we

23  still see to this day in your current prison incident reports.

24  Then a disturbing the peace incident for disruptive,

25  disrespectful, and concerning behavior at school and toward

1   your teacher.  A break in 2019, charges of just misrepresenting

2   an ID when the car you were in had a gun and a credit card

3   scanner.  That involved another violation of court supervision.

4       December 2020, you had a firearm concealed in your

5   waistband and you fled from police.  That was resolved in 2022.

6   In 2019, a larceny and domestic violence incident resulting in

7   sentencing on August 12th of 2021.  The first to involve your

8   former partner, you got into a fight.  It's reported that at

9   first you would not let her leave your home.  Again, a familiar

10  sign that we see with the kidnapping.  You threw a phone in her

11  face.  And pushed her out the door, then threatened her mom's

12  boyfriend who came to pick her up.  You pled guilty, and after

13  you failed to appear for sentencing in June of 2020, you were

14  arrested and firearms were recovered.  In August of 2021, you

15  were sentenced to credit for time served and two-years

16  probation.  There were numerous probation violations.  This

17  same August, 2021 timeframe you were sentenced on a 2020

18  offense for having a credit card skimming device and ten blank

19  gift cards that officers recovered following another

20  altercation between you and your former partner.

21      There were probation violations here, too, resulting in

22  your HIDTA status being revoked and a sentence being imposed.

23  On November 9, 2021, one week before the kidnapping, you had

24  another incident with your former partner that resulted in you

25  firing numerous gunshots at her car while she was leaving.  At

1    that time officers found two stolen vehicles at your residence.

2        The following week was the kidnapping and your shooting.

3    You were being shot, but you were not arrested for the offense

4    at that time.  So, from November 18 of 2021 through August 4,

5    2022, a number of warrants were issued.  You failed to do

6    programming.  You engaged in assaults.  You had firearms,

7    ultimately resulting in a probation violation sentence that

8    you're currently serving.

9        And in between all of this, we have the November 14,

10   November 15, 2021 kidnapping.  It had been a November of

11   shootings and retaliations for the 1125 Gang.  So, when you and

12   Ms. Jackson were carjacked, it seems that concern number one

13   after getting you treatment, was retaliation.  Retaliation

14   against Ms. Jackson.  And retaliation against others involved.

15       It was clear from her testimony that the two of you had

16   been close.  She thought of you like a cousin.  She stayed

17   around after the bullets flew to make sure you were okay.  She

18   went with you to the hospital.  And even three years later, it

19   was clear from her testimony that making you believe her, that

20   she was not involved, was still her primary concern.

21       But you and your friends did not reciprocate her concern.

22   You-all decided that she needed to be punished for something,

23   it turns out, she didn't do.  I recognize that you may not be

24   there yet.  You decided that she needed to provide information

25   to you.  So, while you were receiving treatment, some other

 1   gang members took this 19-year-old girl, who thinks she's being
 2   driven to safety after a traumatic experience to an abandoned
 3   field where she's interrogated and assaulted at gunpoint.  And
 4   you don't think she's terrified?  She urinated on herself.

 5        And then more young men with guns arrive to put her in
 6   another car and take her to your home.  Not one of their homes,
 7   they took her to your home.  Where even more young men with
 8   guns arrive until Ms. Jackson is alone in your residence
 9   surrounded by armed gang members, while being interrogated and
10   blamed for something she did not do.

11        Soon, some other young women arrive, courtesy of a phone
12   call by Semaj Ayers, including your cousin Maijah Green, yet
13   another connection to you.  But they're not coming to help.
14   They have one purpose, to beat Ms. Jackson up.  And they do.
15   They physically assault her several times while the boys
16   watched, while she screamed, and cried as her hair was pulled
17   out, her fingernails were torn off, and she suffered a
18   contusion and a broken blood vessel in her eye.  And to top it
19   off, have you come home and hit her with your crutches.  Then
20   you tell the girls to take her and show them where Amaiya
21   Bryant lives and to assault her again.

22        The next day more shootings involving the 1125 Gang and
23   its rival gang, resulting in the death of one of your members
24   and the shooting of the aunt of one of the suspected
25   carjackers.  The retaliation had continued.

**Sentencing By The Court**
**Thursday/December 19, 2024**

1      You don't think this was kidnapping.  But the next day in

2  a group chat, Nasir Lewis told you it was kidnapping.  Several

3  of your co-defendants have admitted it was kidnapping.  And the

4  jury found that it was kidnapping.  It was a terrifying,

5  life-altering, security-shattering event.  Or as Ms. Brunson

6  said, earth-shattering.  Ms. Jackson thought she was going to

7  die.

8      In realtime as it was happening, not made up for trial,

9  she was texting her mother.  Starts with just, "Momma. They

10  just robbed us.  I'm on the way to you."  Because she thought

11  that the people who came to pick her up were taking her home.

12  "They just shot Tez."

13      And then the mother's frantic responses, several of them.

14  Waiting for a response from her daughter.

15      "I'm good."

16      "Just got jumped."

17      "Held hostage."

18      "'Finna die probably."

19      This is early in the event.  And then it continues.  The

20  mother's frantic responses.  Nothing.  And then:

21      "Send me an address close to you.  Hurry.  Not our

22  address."  Again, "I'm 'finna die.  I can't talk."

23      "Send me an address, 'addy' close to you."

24      "Like I'm 'finna die."

25      Again, mother's frantic responses.  Until you-all finally

 1   release her and she says to her mother, "Hurry before they come

 2   back," after being held for more than seven hours.  That is the

 3   nature and circumstances of the offense, which is one of the

 4   sentencing factors that I have to consider.

 5       These are the serious and dangerous offenses that result

 6   in guideline ranges in excess of 20 years for young people who

 7   have spent much of their young lives in trouble.  And I know,

 8   Mr. Blake, and you've said to me from the beginning, you have

 9   wanted to know why these guideline ranges are so high.  And

10   it's because this offense is so serious and so dangerous, and

11   because you have such a significant criminal history.

12       The nature, circumstances, and seriousness of the offense,

13   as well as your history and characteristics, are just some of

14   the relevant sentencing factors.  And now you have to think

15   about the other sentencing factors that the law requires me to

16   consider.  Imposing a sentence that will promote respect for

17   the law.  You have shown none.  You don't just have convictions

18   for violating the law, you violate your court supervision.  And

19   you faced not just a sentence for the kidnapping but for those

20   probation violations as well.

21       Another factor, imposing a sentence that will afford

22   adequate deterrence and punishment.  One that will prevent you,

23   and others like you, from doing anything like this in the

24   future.  At this stage of your life, I don't have good reason

25   to believe that you are beyond street justice, retaliating

1   against people who think that they have is wronged you.  And I
2   appreciate, Mr. Blake, that you seem to recognize that.  And as
3   you indicated, you're not ready to go back into the real world.
4   And trust yourself that you wouldn't engage in street justice.
5   Juvenile detention.  Suspension from school, short prison and
6   probation sentences has done nothing to deter your criminal
7   conduct.  I see now that the misconduct has occurred even while
8   you've been detained.  Misconducts for fighting, damaging
9   property, breaking rules.

10       Another factor I have to consider is imposing a sentence
11   that will protect the public.  You have a history of anger
12   issues and dangerous outbursts.  As the Government describes,
13   you lack impulse control.  You are connected to a gang.
14   Connected to dangerous shootings.  I've seen how you've treated
15   woman that you claim to care about.

16       Another factor I have to consider is imposing a sentence
17   that will provide you with needed treatment and training.  You
18   may have previously been diagnosed with ADHD, disruptive
19   disorder, non-specified mood disorder.  You have not had much
20   treatment and you need it, and you recognize that you need it.
21   And your lawyer tells me that you're receptive to receiving it.
22   In 2019, you struggled emotionally after some fights with your
23   significant other.

24       There are clearly unresolved mental health issues from
25   your youth.  You have self-medicated with marijuana since age

14.  And then Percocet and Adderall as you got older.  I'm
hopeful that you are receptive to both mental health and
substance abuse treatment.  Those are going to be very
important parts of your future.

The situation with your family remains unfortunate.  Your
mom has relocated to an unknown area.  As I understand it,
though, your dad is now a truck driver, and you're in touch
with some of your siblings.  At least at the time I received
the presentence report, it indicated that you had been in a
relationship with a young woman who remains supportive of you.
You said she's all I've got.  But you also have your friends.
You told me today that they're all you have.  You also have a
four-year-old son.  I hope that he will become the priority in
your future.  I hope that you can have a relationship with him
different than the relationship you have with your father.

I appreciate that you've given some thought to your
future.  You would like to earn your GED.  You would like to
earn your CDL license so that you, too, can be a truck driver.
You can get educational and vocational programming when you get
designated to a Bureau of Prison's facility, and during the
period of time that I'm going to put you on supervised release.
Your lawyer tells me that in addition to being receptive to
engaging in that programming that you would be receptive to
mental health treatment to help change your behavior.  I hope
that you will actively participate in all of the programming,

1   all of the treatment, all of the counseling that the BOP and

2   The Court is going to try to provide to you over these next

3   many years.

4        Because Mr. Blake, you are only 23 year's old and yes, you

5   are facing a significant sentence.  As I was explaining to your

6   lawyer inquiring if he had explained to you, you have the

7   opportunity to earn good time credits off of your sentence if

8   you find a way to stay out of trouble.  But you're not going to

9   get good time credits if you're engaged in fights in prison, if

10  you don't follow the rules in prison.  And just a simple math,

11  you get about two months a year.  So, if somebody were to be

12  sentenced to ten years in prison, they could get amount two

13  years off of their sentence.  But they're good time credits.

14  You're not going to get them for the behavior I see in the 18

15  pages of incident reports that I have from Milan.

16       I'm hoping that the next phase of your life will read more

17  favorably than the presentence report, will involve more

18  maturity, better conduct, better decision-making, far different

19  than what I heard about and saw in the courtroom.  And more in

20  line with what you've expressed today.  You're an intelligent

21  young man, Mr. Blake, and you've had a difficult life so far.

22  And you've done some bad things.  But you're not hopeless.  And

23  there are a few things here I don't agree with Mr. Sabbota on

24  mostly in terms of the role of the victim here.  But you are

25  still going to be a relatively young man when this is over, and

1    you're going to need to find a way to change this pattern, if,

2    as Mr. Sabbota said, I do agree with him, you don't want to

3    spend the rest of your life in prison, and I don't think you

4    want to spend the rest of your life in prison.

5         I also have to avoid unwarranted sentencing disparities.

6    I often look at statistics that I get from the Sentencing

7    Commission to help me with this evaluation.  They're not

8    terribly helpful here because there are not enough defendants

9    in the last five years that have your final offense level and

10   your criminal history category.  The sentencing guideline

11   amendment for considering a defendant's youth also only went

12   into effect on November 1.  So, there's not a lot of history

13   there either.

14        You probably know that I sentenced Ms. Williams and Greene

15   to 96 months.  They had lesser roles in the offense.  They had

16   lesser criminal histories.  They had different histories and

17   characteristics.  And they accepted responsibility, they

18   admitted what they did, and they expressed remorse.  They don't

19   continue to blame the victim.  So, I'll end where I started.

20        I do believe that your youth played a major role here.

21   You have a two point conviction from when you were just 14

22   years old.  That's the difference between being Criminal

23   History Category IV rather than Criminal History Category V.

24   Then under 5H1.1, if I consider not only your youth, but your

25   exceedingly troubled youth, and consider a two-level reduction

 1  in your base offense level, that gives me a guideline range at

 2  base offense level of 34 and criminal history category four of

 3  210 to 262 months.

 4      Something else that I don't disagree with Mr. Sabbota on

 5  is that 15 to 20 years is probably the right range.  That is a

 6  sentence that would be sufficient but not greater than

 7  necessary, to achieve the purposes of the 3553(a) factors and

 8  to also recognize the seriousness of the offense.  And

 9  recognize the seriousness of the impact to the victim's life.

10      So, considering all of the 3553(a) factors, and especially

11  trying to balance the seriousness of the offense and the need

12  to punish and deter this conduct and protect the public, with

13  your youth, mental health and substance abuse issues, and

14  recognizing how high the guideline ranges are here, I think a

15  sentence below your guideline range, whether I call it a

16  departure or a variance, a departure most likely under 5H1.1

17  would still be sufficient but not greater than necessary.

18      And so, Mr. Blake, The Court is going to sentence you as

19  follows:

20      On Count One of the superseding indictment -- on Count

21  Two, I'm sorry.  It was Count Two is the --

22          **MR. SABBOTA:**  It is Count Two.

23          **THE COURT:**  Count Two, right.

24      **Count Two of the superseding indictment, pursuant to the**

25  **Sentencing Reform Act of 1984, The Court considering the**

**Sentencing By The Court**
**Thursday/December 19, 2024**

1   **sentencing guidelines and factors contained 18 United States**

2   **Code Section 3553(a), hereby commits you to the custody of the**

3   **Bureau of Prisons for a term of 198 months.**

4       I am going to recommend that you be placed at a facility

5   with a residential drug and alcohol program.  I'm going to

6   recommend all the vocational and educational training

7   available.  I'm going to recommend mental health treatment.

8       I don't know, Mr. Sabbota, if you want me to include any

9   particular place in the judgment for Mr. Blake's --

10          **MR. SABBOTA:**  Not at this time, Your Honor.  My gut

11  is probably in Indiana.  But let the Bureau of Prisons do that.

12          **THE COURT:**  All right.  Then I won't include a

13  recommendation.

14          **MR. SABBOTA:**  Thank you.

15          **THE COURT:**  Once you finish your sentence, Mr. Blake,

16  I am going to put you on supervised release for a term of five

17  years.

18      I am going to order that you pay a special assessment of

19  one hundred dollars, which will be due immediately.  I'm going

20  to waive any fines, any cost of incarceration, and any cost of

21  supervision due to your lack of financial resources.

22      I am going to order mandatory drug testing.

23      Pursuant to 34 United States Code Section 40702, you will

24  have to cooperate with the collection of a DNA sample as

25  directed by the probation officer.  And during the period of

1  time that you're on supervised release, you will have to abide

2  by the standard conditions that have been adopted by the United

3  States District Court for the Eastern District of Michigan.

4  And I am incorporating those conditions as if I were reading

5  them aloud here in court today.  And I'm going to impose some

6  special conditions:

7       Due to your personal history and the characteristics of

8  the instant offense, I'm going to have you submit to a

9  psychological and/or psychiatric evaluation as directed by the

10  probation officer.

11       You must participate in a mental health treatment program

12  and follow the rules and regulations of the program.  Your

13  probation officer, in consultation with your treatment

14  provider, will supervise your participation in the program.

15  You must successfully complete any trauma assessments and/or

16  evaluations as directed by the probation officer.  You must

17  participate in a trauma focused cognitive behavioral treatment,

18  and/or moral recognition therapy program and follow the rules

19  and regulations of that program.  Your probation officer,

20  again, will supervise your participation in that the program.

21  Those programs, should your assessments and/or evaluations deem

22  them necessary, may include education, group therapy and

23  structured exercises.

24       You shall not be a member of, or associated with, any

25  group oriented in whole or in part, toward criminal purpose,

 1  commonly referred to as, "A gang."  Should not have any gang

 2  affiliation.  Should not be found in the social company of any

 3  person who you know or reasonably ought to know is a member of

 4  or associated with a gang.

 5      You shall not possess, wear or display in any manner, any

 6  insignia, clothing, articles of clothing, designed, arranged or

 7  used in any way to symbolize membership in, affiliation with or

 8  approval of a gang.

 9      I'm going to have you submit your person, residence,

10  office, vehicles, papers, business, or place of employment and

11  any property under your control to a search.  Such a search is

12  shall be conducted by a United States probation officer at a

13  reasonable time and in a reasonable manner, based upon a

14  reasonable suspicion of contraband or evidence of a violation

15  of a condition of release.  Failure to submit to the search may

16  be grounds to revoke your supervised release.  You must warn

17  any residence that the premises may be subject to that search.

18      And because I'm not imposing any financial penalties or

19  restitution here, I'm not going to impose any provisions that

20  have to do with your finances.

21      I will also -- I will make this sentence concurrent to

22  your undischarged terms of imprisonment in the 16th Circuit

23  Court, Docket Numbers 2021-001301-FH, and 2019-003086-FH.

24      All right.  Then let me ask counsel, are there any

25  objections to the sentence just imposed that have not

1   previously been stated?  Ms. Brunson.

2            **MS. BRUNSON:**  No, Your Honor.  Thank you.

3            **THE COURT:**  And Mr. Sabbota.

4            **MR. SABBOTA:**  No, Your Honor.

5                          **Appeal Rights**

6            **THE COURT:**  All right.  I will also advise Mr. Blake,

7   you have a right to appeal the sentence that I've just given to

8   you.  Any notice of appeal would have to be filed within

9   14-days of the date that I enter final judgment or 14-days of

10  any notice of appeal filed by the Government.  If you can't

11  afford to prepay the cost of appeal, you may seek leave to

12  appeal without paying those costs.  And if you need help in

13  preparing a notice of appeal, you may ask the clerk of The

14  Court to help you in preparing that notice.  Do you understand

15  that?

16           **THE DEFENDANT:**  Yes, Your Honor.

17           **THE COURT:**  All right.  Then with that, is there

18  anything else that we need to do on Mr. Blake's case today?

19  Ms. Brunson, anything for the Government?

20           **MS. BRUNSON:**  No, Your Honor.  Thank you.

21           **THE COURT:**  Mr. Sabbota, anything for Mr. Blake?

22           **MR. SABBOTA:**  No, Judge.

23           **THE COURT:**  And Ms. Wild, anything from probation?

24           **PROBATION OFFICER:**  Nothing from probation, Judge.

25           **THE COURT:**  All right.  Everyone.  Thank you very

1    much.

2        Mr. Blake, take care of yourself.

3            **THE DEFENDANT:**  You too.  Thank you.

4        **(Whereupon proceedings concluded at 3:44 p.m.)**

5                    -    -    -

Appeal Rights
Thursday/December 19, 2024

50

3                           -   -   -

4                   **C E R T I F I C A T I O N**

5               I, Nefertiti A. Matthews, official court reporter

6       for the United States District Court, Eastern District of

7       Michigan, Southern Division, appointed pursuant to the

8       provisions of Title 28, United States Code, Section 753,

9       do hereby certify that the foregoing is a correct

10      transcript of the proceedings in the above-entitled cause

11      on the date hereinbefore set forth.

12              I do further certify that the foregoing

13      transcript has been prepared by me or under my direction.

15  Date: February 18, 2025

17  s:/Nefertiti A. Matthews
    Nefertiti A. Matthews,
18  Official Court Reporter

19                          -   -   -

22-20519; United States of America v. Cortez Blake, Et Al